UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ELIAS DAGHER, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. |
|  | : | CLASS ACTION |
| Plaintiff, | : : | |
| vs. | : : | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| TRIANGLE CAPITAL CORPORATION, E. ASHTON POOLE, STEVEN C. LILLY and GARLAND S. TUCKER, III, | : : : : : | |
| Defendants. | : : | |
|  | x | DEMAND FOR JURY TRIAL |

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Triangle Capital Corporation ("Triangle" or the "Company"), Company press releases, earning calls, analyst reports and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all purchasers of Triangle common stock between May 7, 2014 and November 1, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

4.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, the common stock of Triangle trades in this District on the New York Stock Exchange ("NYSE").

## THE PARTIES

5.      Plaintiff Elias Dagher purchased Triangle common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

6.      Defendant Triangle is a business development company.

7.      Defendant E. Ashton Poole ("Poole") is President, Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Triangle.  He assumed the position of CEO in February 2016, prior to which he was the Chief Operating Officer ("COO") of the Company.

8.      Defendant Steven C. Lilly ("Lilly") is Chief Financial Officer ("CFO"), Secretary and a director of Triangle.  He is also a co-founder of the Company.

9.      Defendant Garland S. Tucker, III ("Tucker") is a director and co-founder of Triangle. He was Chairman of the Board until May 2017 and CEO of the Company until February 2016.

10.      The defendants referenced above in ¶¶7-9 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false and misleading statements that artificially inflated the price of Triangle common stock during the Class Period.

11.      The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Triangle's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

12.     Defendant Triangle is a specialty finance company that provides customized financing to lower middle market companies located primarily in the United States. The Company focuses on lending to private companies with annual revenues between $10.0 million and $250.0 million.

13.     Triangle is regulated as a business development company, or "BDC," under the Investment Companies Act of 1940. The purported investment objective of Triangle is to generate attractive returns by generating current income debt investments and capital appreciation equity-related investments.   In turn, Triangle pays out this investment income in dividends to its shareholders. The rate and amount of these dividend payments is critical to the market's valuation of Triangle.

14.     The quality and robustness of Triangle's underwriting and valuation policies, practices and procedures are also critical to investors evaluating the Company. Triangle provides loans in small- to mid-size private companies for which limited public information is available. Investors rely on Triangle to be able to appropriately value and price the risks associated with investing in these companies and to identify profitable investment opportunities so that it can receive a return on its investments and avoid writing down assets or placing loans on non-accrual.

15.     During the Class Period, Triangle used an aggressive form of fair value accounting by which it recognized loan income before the income was actually paid to the Company. Triangle did this in a variety of ways, including by recognizing payment-in-kind ("PIK") interest provisions as income even though such income may never actually be paid to the Company. PIK is contractually

- 3 -

deferred interest added to principal and generally due at the end of the loan term. When a borrower cannot pay normal interest terms, PIK provisions can be used in a refinanced loan to nominally increase loan income while at the same time rendering that income more speculative as payment is deferred until the end of the loan term. This allowed Triangle to defer the recognition of losses and loan write-downs until later in the life of the loan and to conceal poor loan performance.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

16.     The Class Period begins on May 7, 2014. On that date, Triangle issued a press release announcing its financial results for the quarter ended March 31, 2014. The release stated that the fair value of the Company's investment portfolio was $690 million at quarter end, with $438.6 million in total net assets. The release also stated that Triangle had made $77.5 million in new investments during the quarter. The release quoted defendant Tucker, Triangle's then-CEO, as stating: "'The first quarter represented the beginning of the more active year we are expecting 2014 to be, with new portfolio investments totaling more than $77 million. . . . Our activity during the quarter supports our optimism for the year, as we believe the lower middle market is poised to provide attractive investment opportunities during the balance of 2014.'" That same day, the Company filed its quarterly results on Form 10-Q, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

17.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results. On the call, defendants stressed the purported quality of the Company's investments during the quarter and the robustness of Triangle's underwriting and risk assessment policies and procedures. For example, defendant Poole, who was then Triangle's COO, stated that the Company was "*focusing on quality over quantity* in terms of [its] investment pace per quarter," and that the Company was being particularly "discriminate in how [it is] reviewing opportunities and

choosing to invest" and turning away lower quality investment opportunities.  Defendant Poole also stated that Triangle was passing on lower-quality "B deals" so that it could "focus on the A deals." Later, he continued in pertinent part as follows:

> So I think we are thinking about it as a great way to **continue to prudently invest the liquidity** that we have had over the last year and the firepower that **we've reserved for a more fruitful investing environment, which we believe is clearly unfolding** or has unfolded as we've seen in Q1 and hopefully will continue to do so in Q2, Q3, and Q4.

18.     On the conference call, defendant Lilly, who served as Triangle's CFO, likewise described the Company's investing philosophy: "[T]he primary keys to a successful long-term track record in the [BDC] industry are to **maintain on[e's] credit focus, remain conservative and consistently apply an underwriting formula** that produces solid results."

19.     On August 6, 2014, Triangle issued a press release announcing its financial results for the quarter ended June 30, 2014. The release stated that the fair value of the Company's investment portfolio was $736.3 million at quarter end, with $445.8 million in total net assets.  The release also stated that Triangle had made $87.3 million in new investments during the quarter.  The release quoted defendant Tucker as stating: "'The second quarter of 2014 was robust on all fronts.  We made $87.3 million of investments . . . .  Again, it is an exciting time for Triangle and it gives me great pleasure to be able to share such good news with our investors.'"  That same day, the Company filed its quarterly results on Form 10-Q, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

20.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results.   On the call, defendants stressed the purported quality of the Company's investments during the quarter and the robustness of Triangle's underwriting and risk assessment policies and procedures.  For example, defendant Lilly stated:

- 5 -

During 2014, as the market has naturally shifted back to a healthy amount of M&A activity, we have found that our patience has been rewarded and *we have taken advantage of what we perceive to be high-quality investment opportunities at attractive price points*. As a result, as we enter the second half of the year, we are becoming increasingly convinced that 2014 could end up being one of TCAP's most active years in terms of new investments.

21.     On November 5, 2014, Triangle issued a press release announcing its financial results for the quarter ended September 30, 2014.  The release stated that the fair value of the Company's investment portfolio was $841.6 million at quarter end, with $547.4 million in total net assets.  The release also stated that Triangle had made $180.8 million in new investments during the quarter.  The release quoted defendant Tucker as stating: "'The third quarter of 2014 was extremely active for Triangle.  We originated a record $181 million of new investments . . . .'"  That same day, the Company filed its quarterly results on Form 10-Q, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

22.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results.   On the call, defendants stressed the purported quality of the Company's investments during the quarter and the robustness of Triangle's underwriting and risk assessment policies and procedures.   For example, defendant Tucker stated: "[W]e are pleased that the origination portion of our business is operating so well.  Our investment pipeline has been robust all year, and *we remain very pleased with the quality of the new investments* we've made."  Defendant Poole provided additional commentary on the purported quality of Triangle's new investments during the quarter, stating in pertinent part as follows:

I think, obviously the question is always – what is the quality of that flow, and which investments do we feel are the right ones to pursue on behalf of our shareholders?   And I can assure you that we spend quite a bit of time on that question.

And so when we think about pipeline, and when you guys think about pipeline, I think it really has to be measured in two ways. One is just externally, how much – or what is the amount of flow of opportunities coming in the door, and then

the subset of that flow that we choose to pursue.  And on both accounts, ***I can safely say that our pipeline is healthy.***

23.     On March 2, 2015, Triangle issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2014.  The release stated that the fair value of the Company's investment portfolio was $887.2 million at year end, with $530.8 million in total net assets.  In addition, the release stated that Triangle had only 5.8% and 3.0% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $129 million in new investments during the fourth quarter.  The release quoted defendant Tucker as stating: "'The fourth quarter represented a strong end to the year for Triangle Capital.  We remained active in the investing market [and] we generated a record amount of investment income . . . .  As we move into 2015 we are pleased with the quality of our investment portfolio, the strength of our balance sheet, and the opportunities we see across the lower middle market.'"  That same day, the Company filed its quarterly and annual results on Form 10-K, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

24.     Also on March 2, 2015, Triangle held an earnings call with analysts and investors to discuss its financial results.  On the call, defendants stressed the purported quality of the Company's investments and the robustness of Triangle's underwriting and risk assessment policies and procedures.  For example, defendant Tucker stated: "As we begin 2015, we are reminded that the most successful BDCs are those that continually exercise corporate discipline in areas such as investment prudence" and those that "resisted certain temptations, such as growing their investment portfolios in an irrational way."

25.     Similarly, defendant Poole stressed that Triangle had been selective in its investments and focused on quality over quantity in securing sound investments, stating in pertinent part as follows:

- 7 -

In the lower middle market, we are finding that financial sponsors are entering 2015 with a very optimistic view. For the first time in a number of years, there is significant inventory available in terms of both first-time sellers of private companies coupled with a healthy backlog of sponsor-to-sponsor trades, which in recent years have become a meaningful component of the market.

Balancing against this robust level of inventory is ***our internal view that not every company meets our underwriting standards***. And so while our deal teams are very busy analyzing a healthy number of opportunities, you can expect that ***we will continue to remain focused on quality versus quantity*** in terms of new investment activity.

26.     On May 6, 2015, Triangle issued a press release announcing its financial results for the quarter ended March 31, 2015.   The release stated that the fair value of the Company's investment portfolio was $877.4 million at quarter end, with $519.6 million in total net assets.   In addition, the release stated that Triangle had only 6.1% and 2.7% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.   The release also stated that Triangle had made $98.2 million in new investments during the quarter.   The release quoted defendant Tucker as stating: "'We are pleased that we were able to follow a strong fourth quarter of 2014 with another strong quarter to begin 2015. . . .  ***We remain confident in both the overall quality of our investment portfolio*** and the investment opportunities in the lower middle market for the remainder of 2015.'"   That same day, the Company filed its quarterly results on Form 10-Q, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

27.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results.   On the call, defendants stressed the purported quality of the Company's investments during the quarter and the robustness of Triangle's underwriting and risk assessment policies and procedures.   For example, defendant Poole stated that he and management "feel very good" about Triangle's new investments during the quarter, and that the Company was "very focused on maximizing yields on behalf of [its] investors."   Similarly, defendant Lilly stated:

"*[Q]uality over quantity*, . . . that's what we try to focus on, and always have, and I think *that will be the biggest guide post* as we move forward."

28.     On August 5, 2015, Triangle issued a press release announcing its financial results for the quarter ended June 30, 2015.  The release stated that the fair value of the Company's investment portfolio was $884.9 million at quarter end, with $514.8 million in total net assets.  In addition, the release stated that Triangle had only 3.1% and 1.6% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $65.1 million in new investments during the quarter.  The release quoted defendant Tucker as stating: "'The second quarter was another active quarter for Triangle. . . .  Our expanded balance sheet enables Triangle to focus on new portfolio opportunities during the remainder of 2015.'"  That same day, the Company filed its results on Form 10-Q, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

29.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results.   On the call, defendants stressed the purported quality of the Company's investments during the quarter and the robustness of Triangle's underwriting and risk assessment policies and procedures.  For example, defendant Tucker stated: "[W]e *decided to pass* on a greater percentage of transactions during the first half of the year *rather than stretch our credit metrics* in a manner that would not be consistent with our historical underwriting standards."  Defendant Lilly continued on this same theme in response to an analyst question, stating: "I think thematically what you continue to hear from us is, *we're not trying to grow the portfolio purely for growth*.  Say, we're trying to find the best risk adjusted returns we can."

30.     On November 4, 2015, Triangle issued a press release announcing its financial results for the quarter ended September 30, 2015.  The release stated that the fair value of the Company's

- 9 -

investment portfolio was $968.1 million at quarter end, with $515.7 million in total net assets.  In addition, the release stated that Triangle had only 2.0% and 0.7% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $189.2 million in new investments during the quarter.  The release quoted defendant Tucker as stating: "'The third quarter was an extremely active quarter for Triangle. The recent volatility in the broader credit markets has accrued to our benefit as *__we were able to originate a record level of new investments in high quality companies__* during the quarter.  Needless to say, we are pleased that we exercised patience during the first half of the year and maintained sufficient liquidity to take advantage of what we perceive to be an opportune time in the investing market.'"  That same day, the Company filed its quarterly results on Form 10-Q, which defendants Tucker and Lilly certified were accurate, not misleading and free from fraud.

31.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results.   On the call, defendants stressed the purported quality of the Company's investments during the quarter and the robustness of Triangle's underwriting and risk assessment policies and procedures.  For example, defendant Tucker stated: "As we move to the end of 2015, and begin to look forward to 2016, I believe Triangle has successfully navigated this rough patch *__with the same measure of discipline and focus__* that our team employed to navigate the success-filled days and quarters before."  On the call defendant Lilly also made the point that the Company was selectively choosing investments that promised the best risk-adjusted returns pursuant to a robust underwriting process, stating in pertinent part as follows:

> In terms of how *__we feel about the current originations, the de facto answer is, we feel very good about them__* or we would not have made the investments to begin with. We look at a lot of opportunities.  As you have heard Ashton say on these calls before, it is not unusual for us to have $2 billion of total flow in a single quarter that we are filtering through in terms of the total consideration.

So, *there is a lot of filtering that goes on*.  We tend to close somewhere between 3% and 5% of what we look at.  We are very much aligned with that this quarter and I think feel really good about those.

32.     Defendant Poole also represented that Triangle had expanded its investments into attractive opportunities by focusing on credit discipline, stating in pertinent part as follows:

[W]e are pleased to have been cautious during the first half of the year and that we held onto our liquidity to be able to put us in a position to achieve what we believe is a very opportunistic time in the market. . . .

By focusing on our key sponsor relationships, we believe we can better target long-term returns for shareholders by *operating within our credit discipline* and maintaining our focus.

33.     In February 2016, Triangle announced that defendant Poole would be taking over as CEO of the Company, while defendant Tucker would continue to serve as Chairman of the Board.

34.     On February 24, 2016, Triangle issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2015.  The release stated that the fair value of the Company's investment portfolio was $977.3 million at year end, with $508.4 million in total net assets.  In addition, the release stated that Triangle had only 2.0% and 0.7% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $101.5 million in new investments during the fourth quarter.  The release quoted defendant Poole as stating: "'We are pleased to report a strong finish to 2015 . . . .  As we move into 2016, we believe our investing platform is well positioned to continue capitalizing on the attractive opportunities the lower middle market provides.'"  That same day, the Company filed its quarterly and annual results on Form 10-K, which defendants Poole and Lilly certified were accurate, not misleading and free from fraud.

35.     The next day, Triangle held an earnings call with analysts and investors to discuss its financial results.  On the call, defendants stressed the purported quality of the Company's investments and the robustness of Triangle's underwriting and risk assessment policies and

- 11 -

procedures. For example, defendant Poole stated: "2015 for Triangle was marked by several notable items. First, *we excelled in originating high-quality, new investments in the lower middle market*, as 2015 represented our second-most active investing year on record, with over $450 million in total capital deployed."

36. On May 4, 2016, Triangle issued a press release announcing its financial results for the quarter ended March 31, 2016. The release stated that the fair value of the Company's investment portfolio was $940 million at quarter end, with $504.3 million in total net assets. In addition, the release stated that Triangle had only 3.6% and 0.9% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively. The release also stated that Triangle had made $11.8 million in new investments during the quarter. That same day, the Company filed its quarterly results on Form 10-Q, which defendants Poole and Lilly certified were accurate, not misleading and free from fraud.

37. On August 3, 2016, Triangle issued a press release announcing its financial results for the quarter ended June 30, 2016. The release stated that the fair value of the Company's investment portfolio was $930.8 million at quarter end, with $498.3 million in total net assets. In addition, the release stated that Triangle had only 5.6% and 2.2% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively. The release also stated that Triangle had made $63.6 million in new investments during the quarter. That same day, the Company filed its quarterly results on Form 10-Q, which defendants Poole and Lilly certified were accurate, not misleading and free from fraud.

38. In October 2016, Triangle announced that Brent P.W. Burgess was resigning his positions as the Company's Chief Investment Officer and a member of the Board.

39.     On November 2, 2016, Triangle issued a press release announcing its financial results for the quarter ended September 30, 2016.  The release stated that the fair value of the Company's investment portfolio was $947.7 million at quarter end, with $619.4 million in total net assets.  In addition, the release stated that Triangle had only 3.9% and 2.1% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $88.4 million in new investments during the quarter.  That same day, the Company filed its quarterly results on Form 10-Q, which defendants Poole and Lilly certified were accurate, not misleading and free from fraud.

40.     On February 22, 2017, Triangle issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2016.  The release stated that the fair value of the Company's investment portfolio was $1.04 billion at year end, with $611.2 million in total net assets.  In addition, the release stated that Triangle had only 3.5% and 1.5% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $155.6 million in new investments during the fourth quarter.  That same day, the Company filed its quarterly and annual results on Form 10-K, which defendants Poole and Lilly certified were accurate, not misleading and free from fraud.

41.     On May 3, 2017, Triangle issued a press release announcing its financial results for the quarter ended March 31, 2017.  The release stated that the fair value of the Company's investment portfolio was $1.13 billion at quarter end, with $729.2 million in total net assets.  In addition, the release stated that Triangle had only 4.2% and 2.2% in non-accrual assets as a percentage of the Company's total portfolio at cost and at fair value, respectively.  The release also stated that Triangle had made $161.5 million in new investments during the quarter.  That same day,

the Company filed its quarterly results on Form 10-Q, which defendants Poole and Lilly certified were accurate, not misleading and free from fraud.

42.     The statements referenced in ¶¶16-32, 34-37, 39-41 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     that, as early as 2013, Triangle's investment professionals had internally recommended moving away from mezzanine loan deals due to changes in the market that no longer made these investments attractive risk-reward opportunities;

(b)     that the Company's former CEO, defendant Tucker, had ignored the advice of Triangle's investment professionals to chase higher short-term yields by causing Triangle to invest in mezzanine debt despite the poor quality of the loans and their increased risk of defaults and non-accruals;

(c)     that the Company's entire vintage of 2014 and 2015 investments were at substantial risk of non-accrual as a result of the poor quality of the investments and deficient underwriting practices in place at the time of the investments;

(d)     that more than 13% of Triangle's investment portfolio at cost was at risk of non-accrual and, thus, the fair value of the Company's asset portfolio was artificially inflated;

(e)     that Triangle had materially understated the number of loans performing below expectations and/or in non-accrual and had delayed writing down impaired investments;

(f)     that Triangle failed to implement effective underwriting policies and practices to ensure it received appropriate risk-adjusted returns on its investments; and

(g)     that, as a result of (a)-(f), above, Triangle's business, prospects and ability to maintain its dividend level of $0.45 were materially impaired.

43.     On August 2, 2017, Triangle issued a press release announcing its financial results for the quarter ended June 30, 2017.  The release stated that the fair value of the Company's investment portfolio was $1.17 billion at quarter end, with $707.9 million in total net assets.  In addition, the release revealed significant deterioration in the credit quality of the Company's portfolio.  The release revealed that Triangle had moved one investment to full-non-accrual status from PIK non-accrual and that the amount of full non-accrual assets in the Company's portfolio had increased to 5.4% and 2.5% as a percentage of the Company's total portfolio at cost and at fair value, respectively.  Moreover, the Company disclosed that it had moved two investments to PIK non-accrual status, increasing the amount of PIK non-accruals as a percentage of the Company's total portfolio.  The Company also revealed only $0.41 in net investment income per share, which was below the Company's $0.45 per share dividend, and $26.2 million in net unrealized depreciation on its investment portfolio.

44.     On this news, the price of Triangle stock declined ***nearly 15%***, or $2.56 per share, from $17.19 per share on August 2, 2017, to close at $14.63 per share by August 4, 2017, on abnormally high trading volume.

45.     However, the price of Triangle common stock remained artificially inflated, as defendants continued to conceal the true risks to Triangle's business and prospects as a result of the impaired credit quality of its portfolio, defective underwriting practices and the facts and circumstances surrounding Triangle's 2014 and 2015 investments.  For example, on the quarterly earnings call, defendant Lilly stated that it was likely that only two of the five portfolio companies carried below 80% of cost on Triangle's portfolio would go on non-accrual in the next two to four quarters, and only one that carried above 80% of cost "might – it might go on nonaccrual" during that same time frame.

46.     Similarly, in response to an analyst question about how Triangle would "minimize loss or maximize recoveries" from its legacy investments, defendant Poole stated that Triangle had recently improved its credit monitoring capabilities and reassured investors that Triangle had enhanced its abilities to identify trouble areas in its portfolio, stating in pertinent part as follows:

> As far as [the] portfolio management side of the equation, I think you all know that Jeff Dombcik is our Chief Credit Officer and is head of our portfolio management process. We brought on an additional resource to support Jeff in that effort I will say that Jeff's done a terrific job of going back through and examining all of our prior tools and screens and processes for getting ahead in forecasting potential trouble spots in the portfolio by industry and by company, and *we now have a much, much greater visibility or predictability going forward of where we see potential issues.* Jeff is [sic] also applied what I think is just incredible focus and attention on the problem situations that we do have, and has brought great leadership and trying to work through the situations and work either constructively with sponsors in terms of getting to solutions that benefit our shareholders or in cases where we need to exercise more influence directly on our own accord to generate the best outcome for tick up in our shareholders. So collectively, the 2 sides of the coin are much improved in my view and resulting [in] a better performance for the company and for our shareholders.

47.     The statements in ¶¶43, 45-46 were materially false and misleading for the reasons stated in ¶42.

48.     Then, on November 1, 2017, Triangle issued a press release announcing its financial results for the quarter ended September 30, 2017. The release revealed that the fair value of the Company's investment portfolio had declined to $1.09 billion, a decline of nearly 7% from the prior quarter. In addition, the Company revealed that it had suffered $8.9 million in net realized losses and $65.8 million in net unrealized depreciation to its portfolio during the quarter. The Company also disclosed that it had only earned $0.36 per share in net investment income and that it was slashing its quarterly dividend to $0.30 per share, a decline of *33%* from the prior quarter. Most shocking, Triangle revealed that it had placed *seven* new investments on non-accrual status during the quarter, effectively acknowledging that those assets were unlikely to generate future returns, and

that the amount of investments on non-accrual had ***ballooned to 13.4% and 4.7%*** of the Company's total portfolio at cost and at fair value, respectively.

49.     During the earnings call to discuss the results, defendants further surprised investors by revealing that the entire vintage of the Company's investments in 2014 and 2015 had suffered from poor underwriting and investment practices and that the Company had ignored the advice of its own internal investment advisors at the time the investments were made, who had recommended against the strategy ultimately undertaken by the Company.  Defendant Poole explained what had occurred behind the scenes, which dramatically differed from the previous representations he and the other defendants had made to investors, stating in pertinent part as follows:

> During the period from early 2013 through the end of 2015, as large amounts of capital poured into the direct lending space, investment structures and pricing in the lower middle market and broader middle market changed rapidly.  Perhaps most notably by unitranche depth becoming the security of choice by financial sponsors. In addition, leverage levels began moving up in a meaningful way.  The combination of these factors resulted in a rapid decline in pricing as interest rate compression began affecting the leverage lending world.  ***Our investment professionals were aware of these changes and recommended to our former CEO to begin moving away from mezzanine structures*** and into lower yielding but more secure second lien unitranche and senior structures.  Their reasoning was simple.  Companies in our target market were gaining access to additional forms of capital on terms more favorable than what they could have achieved in the past and as a result the traditional risk-reward equation for mezzanine debt did not appear as attractive as it previously had.  Unfortunately the strategic decision was made not to move off balance sheet in a meaningful way and TCAP continued to lead with a yield focused mezzanine strategy. In the process of doing so ***we added incremental exposure to a number of riskier credits, many of which are now underperforming***. . . .  However, the adherence to a majority focused mezzanine investment strategy when during a period of massive change in the market, ***other investment strategies were available which provided a better risk-reward equation was the wrong strategic call.***  We are continuing to act decisively and aggressively with the goal of moving through our underperforming investments as quickly as possible but at this point we acknowledge that as a firm we are being held back primarily by our 2014 and 2015 investment vintages.

50.     During the call, analysts reacted with shock and frustration.  An analyst even asked defendant Lilly to explain why the Company had not clawed back the executive compensation of

defendant Tucker and Triangle's Chief Investment Officer at the time. Other analysts suggested that the Company needed to completely revamp its underwriting and valuation practices to improve the accuracy of its marks and suggested that an independent third party needed to review Triangle's portfolio, implying that the valuations given by management could not be trusted.

51.     On this news, the price of Triangle stock declined ***nearly 21%***, or $2.57 per share, from $12.25 per share on November 1, 2017, to close at $9.68 per share by November 2, 2017, on abnormally high trading volume.

## LOSS CAUSATION AND ECONOMIC LOSS

52.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Triangle common stock and operated as a fraud or deceit on purchasers of Triangle common stock. As detailed above, when the truth about Triangle's misconduct was revealed, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's price. The declines in Triangle's share price were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the loss suffered by plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members, was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

53.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to

disclose a true and accurate picture of Triangle's business, operations and financial condition, as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Triangle's stock to be artificially inflated.  Plaintiff and other Class members purchased Triangle stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

54.     At all relevant times, the market for Triangle common stock was an efficient market for the following reasons, among others:

(a)     Triangle stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q, filed on November 1, 2017, the Company had approximately 47.7 million common shares outstanding, demonstrating a very active and broad market for Triangle common stock;

(c)     as a regulated issuer, Triangle filed periodic public reports with the SEC;

(d)     Triangle regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, via the Internet and through other wide-ranging public disclosures; and

(e)     unexpected material news about Triangle was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

55.     As a result of the foregoing, the market for Triangle common stock promptly digested current information regarding Triangle from publicly available sources and reflected such

information in Triangle's stock price.  Under these circumstances, all purchasers of Triangle common stock during the Class Period suffered similar injury through their purchase of Triangle common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

56.     Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS"), or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

57.     Triangle's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

58.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Triangle who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action on behalf of all purchasers of Triangle common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are the defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Triangle common stock was actively traded on the

NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Triangle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)     whether the price of Triangle common stock during the Class Period was artificially inflated because of defendants' conduct complained of herein; and

(d)        whether the members of the Class have sustained damages and, if so, the proper measure of damages.

64.        A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

65.        Plaintiff incorporates the foregoing paragraphs by reference.

66.        During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.        Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)        Employed devices, schemes and artifices to defraud;

(b)        Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)        Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Triangle common stock during the Class Period.

- 22 -

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Triangle common stock.  Plaintiff and the Class would not have purchased Triangle common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

69.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Triangle common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

70.     Plaintiff incorporates the foregoing paragraphs by reference.

71.     During the Class Period, defendants acted as controlling persons of Triangle within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Triangle, the Individual Defendants had the power and ability to control the actions of Triangle and its employees.  Triangle controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 21, 2017                ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                         SAMUEL H. RUDMAN


                                                  *s/ Samuel H. Rudman*
                                          _____
                                                  SAMUEL H. RUDMAN

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                          DAVID C. WALTON
                                          BRIAN E. COCHRAN
                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          davew@rgrdlaw.com
                                          bcochran@rgrdlaw.com

                                          JOHNSON FISTEL, LLP
                                          FRANK J. JOHNSON
                                          600 West Broadway, Suite 1540
                                          San Diego, CA  92101
                                          Telephone:  619/230-0063
                                          619/255-1856 (fax)
                                          frankj@johnsonfistel.com

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
sholleman@johnsonfistel.com

Attorneys for Plaintiff

<u>**CERTIFICATION OF PLAINTIFF PURSUANT**</u>
<u>**TO THE FEDERAL SECURITIES LAWS**</u>

I, Eli Dagher, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 10/04/2017 | 150 | 14.05 |

**Sales:**

| Date Sold | | Number of Shares Sold | Selling Price Per Share |
|---|---|---|---|
| 11/1/2017 | 40 | 12.39 | |
| 11/09/2017 | 35 | 9.77 | |
| 11/17/2017 | 25 | 9.60 | |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of November, 2017.

DocuSigned by:

*Eli Dagher*

360D64DBC097435...

Eli Dagher